**JENNER & BLOCK LLP**
Kenneth K. Lee (Cal. Bar No. 264296)
klee@jenner.com
Christina A. Aryafar (Cal. Bar No. 288067)
caryafar@jenner.com
Elizabeth H. Capel (Cal. Bar No. 313390)
ecapel@jenner.com
633 West 5th Street, Suite 3600
Los Angeles, CA 90071-2054
Phone:       (213) 239-5100
Facsimile:   (213) 239-5199

Dean N. Panos (admitted *pro hac vice*)
dpanos@jenner.com
353 N. Clark Street
Chicago, IL 60654-3456
Phone:       (312) 222-9350
Facsimile:   (312) 527-0484

*Attorneys for Defendant*
The Kellogg Company

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TASNEEM L. MOHAMED, on behalf of herself and all others similarly situated<br><br>              Plaintiff,<br><br>       v.<br><br>KELLOGG COMPANY and DOES 1 through 10, inclusive,<br><br>              Defendants. | Case No. 3:14-cv-02449-L-MDD<br><br>**THE KELLOGG COMPANY'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>*Redacted Version of Document Proposed to Be Filed Under Seal*<br><br>Submitted on the Briefs<br>Judge: Honorable M. James Lorenz<br>Courtroom: 5B (5th Floor - Schwartz) |

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 3

    I.  Gardenburger is the Leading Vegetarian Packaged Food Product ...................... 3

    II.  Consumers Purchase Gardenburger Products for a Variety of Reasons ........... 4

    III.  Regulatory Agencies and Consumers Focus on Ingredients in Determining Whether a Food Product is "Natural ........................................ 6

ARGUMENT ............................................................................................................ 7

    I.  Plaintiff's Bare-Bones Conjoint Damages Model Does Not Pass Muster Under the "Rigorous Analysis" Requirement of *Comcast Corp. v. Behrend* ............................................................................................................ 8

        A.  Dr. Howlett's Proposed Conjoint Model Is Woefully Underdeveloped .............................................................................. 8

        B.  The Few Details in Her Proposed Conjoint Analysis Reveal Fundamental Flaws in the Design and Methodology ........................ 11

        C.  A Conjoint Analysis Cannot Calculate a Price Premium Because It Only Measures a Consumer's Willingness-to-Pay ........................... 13

        D.  Dr. Howlett's Analysis Fails the *Daubert* Standard................................ 15

    II.  The Proposed Class Cannot be Certified Because Individual Issues Predominate Over Common Ones..................................................................... 17

        A.  Individual Issues Predominate Because Consumers Have Widely Divergent Understanding of "Made with Natural Ingredients .......... 17

        B.  Individual Issues Predominate Because Consumers Buy Gardenburgers for Widely Differing Reasons .................................... 20

    III.  Plaintiff Is Not an Adequate or Typical Class Representative Because Her Lack of Reliance on the Challenged Term Will Become a Focus of the Trial .................................................................................................... 23

CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Algarin v. Maybelline, LLC,*
300 F.R.D. 444 (S.D. Cal. 2014) ...............................................................20, 23

*Apple, Inc. v. Samsung Elecs. Co.,*
No. 11-01846, 2014 WL 976898 (N.D. Cal. Mar. 6, 2014) ..........................14

*Backus v. ConAgra Foods, Inc.,*
No. 16-454, 2016 WL 7406505 (N.D. Cal. Dec. 22, 2016) ..........................25

*Brazil v. Dole Packaged Foods, LLC,*
660 F. App'x 531 (9th Cir. 2016) ................................................................13

*Briseno v. ConAgra Foods, Inc.,*
674 F. App'x 654 (9th Cir. 2017) ................................................................20

*Chavez v. Blue Sky Natural Beverage Co.,*
268 F.R.D. 365 (N.D. Cal. 2010) ................................................................11

*Clay v. Cytosport, Inc.,*
No. 15-000165, Dkt. No. 210 (S.D. Cal. Sep. 7, 2018) (J. Lorenz) ............16

*Comcast Corp. v. Behrend,*
569 U.S. 27 (2013) ..................................................................8, 11, 13, 17

*Comcast v. Behrend.*
567 U.S. 27 (2013) ..............................................................................passim

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579 (1993) ....................................................................2, 8, 15, 16

*Hanon v. Dataproducts,*
976 F.2d 497 (9th Cir. 1992) ...................................................................3, 23

*Hemmings v. Tidyman's Inc.,*
285 F.3d 1174 (9th Cir. 2002) ..................................................................9, 16

*Hughes v. Ester C Co.,*
317 F.R.D. 333 (E.D.N.Y. 2016) ................................................................13

*In re AutoZone, Inc., Wage & Hour Empl. Practices Litig.*,
    289 F.R.D. 526 (N.D. Cal. 2012)..................................................25

*In re Banc of California Sec. Litig.*,
    -- F. Supp. 3d --, 2018 WL 3868922 (C.D. Cal. May 31, 2018).....................8

*In re Clorox Consumer Litig.*,
    No. 12-00280, 2013 WL 3967334 (N.D. Cal. July 31, 2013).....................17

*In re ConAgra Foods, Inc.*,
    302 F.R.D. 537 (C.D. Cal. 2014)..............................................9, 11

*In re Hain Celestial Seasonings Prod. Consumer Litig.*,
    No. 13-1757, 2015 WL 12001273 (C.D. Cal. Sept. 23, 2015).....................23

*In re NJOY, Inc. Consumer Class Action Litig.*,
    120 F. Supp. 3d 1050 (C.D. Cal. 2015).........................................15

*In re NJOY, Inc. Consumer Class Action Litig.*,
    No. 14-428, 2016 WL 787415 (C.D. Cal. Feb. 2, 2016)..........................15

*In re Vioxx Class Cases*,
    180 Cal. App. 4th 116 (2009)..................................................20

*Jones v. ConAgra Foods, Inc.*,
    No.12-01633, 2014 WL 2702726 (N.D. Cal. June 13, 2014) ...........19, 23, 25

*Joseph v. Costco Wholesale Corp.*,
    No. 14-06899, 2015 WL 12745803 (C.D. Cal. Aug. 27, 2015)....................25

*Kelly v. Cape Cod Potato Chip Co.*,
    81 F. Supp. 3d 754 (W.D. Mo. 2015).......................................18, 19

*Konik v. Time Warner Cable*,
    No. 07-763, 2010 WL 8471923 (C.D. Cal. Nov. 24, 2010).......................17

*Kosta v. Del Monte Foods, Inc.*,
    308 F.R.D. 217 (N.D. Cal. 2015)..............................................20

*Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*,
    89 F.3d 594 (9th Cir. 1996)...................................................15

*Miller v. Fuhu*,
    No. 14-6119, 2015 WL 7776794 (C.D. Cal. Dec. 1, 2015).........................9

DEFENDANT KELLOGG COMPANY'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

*Pelayo v. Nestle USA, Inc.*,
    989 F. Supp. 2d 973 (C.D. Cal. 2013) ................................................................. 18, 19

*Randolph v. J.M. Smucker Co.*,
    303 F.R.D. 679 (S.D. Fla. 2014) ................................................................................ 19

*Saavedra v. Eli Lilly & Co.*,
    No. 12-9366, 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) ................................... 15

*Shirar v. Guerrero*,
    No. 13-906, 2017 WL 6001270 (C.D. Cal. Aug. 2, 2017) ....................................... 16

*Stearns v. Ticketmaster Corp.*,
    655 F.3d 1013 (9th Cir. 2011) .................................................................................. 22

*Townsend v. Monster Beverage Corp.*,
    303 F. Supp. 3d .......................................................................................................... 22

*Townsend v. Monster Beverage Corp.*,
    303 F. Supp. 3d 1010, 1045-46 (C.D. Cal. 2018) .................................................... 20

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) .............................................................................................. 17

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ............................................................................................. 7, 17

*Weisgram v. Marley Co.*,
    528 U.S. 440 (2000) .................................................................................................. 15

*Werdebaugh v. Blue Diamond Growers*,
    No. 12-2724, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) ....................... 9, 10, 11, 13

*Yoon v. Gap, Inc.*,
    No. 08-5712, 2010 WL 11597565 (C.D. Cal. Oct. 6, 2010) ................................... 24

*Younan v. Rolls-Royce Corp.*,
    No. 09-2136, 2013 WL 1899919 (S.D. Cal. May 7, 2013) ...................................... 16

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ..................................................................................................passim

Fed. R. Evid. 702 .......................................................................................................... 15

DEFENDANT KELLOGG COMPANY'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

*Meat and Poultry Labeling Terms*, USDA FOOD SAFETY AND INSPECTION
SERVICE, available at https://www.fsis.
usda.gov/wps/portal/fsis/topics/food-safety-education/get-answers/food-
safety-fact-sheets/ ...................................................................................................7

*Use of the Term "Natural" in the Labeling of Human Food Products;
Request for Information and Comments*, 80 Fed. Reg. 69905 (Nov. 12,
2015) .......................................................................................................................7

*Use of the Term "Natural" in the Labeling of Human Food Products;
Request for Information and Comments,* 80 Fed. Reg. 69906 (Nov. 12,
2015) .....................................................................................................................18

DEFENDANT KELLOGG COMPANY'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

# **INTRODUCTION**

Kellogg makes Gardenburgers, one of the first and most well-known vegetarian "burger" patties. Introduced in 1985, Gardenburger has a loyal cult following among consumers who want to avoid eating beef for ethical, environmental, health, and other reasons. For a few years from July 2010 to January 2016, the packaging of certain Gardenburgers included the phrase "Made with Natural Ingredients." That phrase is factually true, as the Gardenburger patties contain only natural ingredients (such as mushrooms, rice, and onions) and do not include any artificial ingredients.

Nonetheless, Plaintiff Tanseem Mohamed filed this lawsuit, alleging that "Made with Natural Ingredients" is false because the natural soy ingredients have been processed with hexane. Even though hexane is not an "ingredient" and does not remain in the actual final product, Plaintiff insists that "Made with Natural Ingredients" is false. Now, she seeks to certify a class of California consumers who bought Gardenburgers. This Court should deny certification for the following reasons:

First, Plaintiff has failed to offer a "rigorous" class-wide damages model that is consistent with her theory of liability, as required under *Comcast v. Behrend*. 567 U.S. 27 (2013). The Ninth Circuit has held that a plaintiff in a false advertising case can only seek the alleged "price premium" that a company supposedly charges for the challenged statement. Plaintiff, however, has failed to provide a damages model that can accurately isolate that alleged price premium that is attributable to the statement "Made with Natural Ingredients," as required by *Comcast*.

Her expert, Dr. Elizabeth Howlett, submitted a bare-bones expert report that claims that a conjoint analysis — which asks consumers their relative preferences for a variety of attributes for a particular product — can measure the price premium that Kellogg charged for "Made with Natural Ingredients." But she does not provide any details on how she would actually conduct her conjoint analysis. She repeatedly admitted at deposition that she had to conduct additional research before she could even start her conjoint analysis, and

said that she did not even know which attributes she would test for her conjoint analysis. Courts have repeatedly rejected such threadbare damages "analysis" as insufficient under *Comcast*'s "rigorous analysis" requirement. Moreover, her proposed conjoint analysis, even as a theoretical matter, cannot measure the supposed price premium. As Dr. Ronald Wilcox of the University of Virginia explains, Dr. Howlett's conjoint analysis only measures a consumer's willingness-to-pay for a particular attribute (*i.e.*, demand), but a willingness-to-pay is *not* the same as a price premium because price is set by both supply *and* demand. Supply-side and market factors (such as pricing strategy, competition, and advertising) affect the price of a product. Numerous federal courts have accordingly rejected conjoint analysis, ruling that it only measures consumer demand and not price premium. Her opinion also fails to meet the *Daubert* standard.

Second, individual issues predominate over common ones because each class member's understanding of "Made with Natural Ingredients" varies dramatically. For some, it means exactly what it says: it contains only natural *ingredients*, and therefore Gardenburgers are undisputedly "made with natural ingredients" since hexane is not an ingredient. For others, they may agree with the USDA's definition of "natural," which allows the use of that term for any product that has natural ingredients and undergoes minimal processing. Notably, the USDA advised Solae — the company that supplied the hexane-processed soy ingredients used in Gardenburgers — that ████████ ██████████ And others perhaps may adopt Plaintiff's absolutist definition that a packaged food that undergoes *any* processing cannot be described as "made with natural ingredients." This Court would thus have to engage in highly individualized inquiries into each class member's understanding of "Made with Natural Ingredients."

Third, individual issues further predominate because Plaintiff has not provided any class-wide evidence that consumers buy Gardenburgers because of "Made with Natural Ingredients." To the contrary, an internal confidential analysis conducted by Kellogg showed ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████.

This internal finding was corroborated by a test-and-control survey conducted by Dr. Itamar Simonson of Stanford University, one of the titans in the field of consumer marketing. That survey shows that only *0.5%* of the 400+ survey respondents mentioned "natural" as a reason for buying Gardenburgers, and that they place virtually no value to that statement. Plaintiff is a perfect example of a consumer who did not find "Made with Natural Ingredients" to be material in buying Gardenburgers. She testified that she began regularly buying Gardenburgers nearly two decades ago — long before "Made with Natural Ingredients" ever appeared on the packaging — because she enjoyed the taste and sought vegetarian products. As a result, this Court will have to individually analyze why each class member bought Gardenburgers.

Finally, Plaintiff is not an adequate or typical class representative because she did not rely on "Made with Natural Ingredients," and will therefore be subject to unique defenses at summary judgment or trial. The Ninth Circuit in *Hanon v. Dataproducts* held that if there is even a "threat" that a class representative's unique defenses will be the focus of a trial, she is not adequate or typical. 976 F.2d 497, 508 (9th Cir. 1992). It does not matter whether the defendant will ultimately prevail on that defense; the mere fact that the class representative faces unique defenses makes her unqualified. And that is exactly what will happen here: At trial, Kellogg will vigorously argue that Plaintiff — who began regularly eating Gardenburgers *17 years* before "Made with Natural Ingredient" appeared on the packaging — likely never relied on that statement in buying them. This makes her uniquely vulnerable and atypical from other putative class members.

## FACTUAL BACKGROUND

### I.      Gardenburger is the Leading Vegetarian Packaged Food Product.

Gardenburger was established over three decades ago as one of the first packaged vegetarian foods in the United States. Ex. 1, at 2.[1] To this day, it remains one of the top-

---

[1] All exhibits are attached to the accompanying Declaration of Kenneth K. Lee.

selling vegetarian brands.  *See* Ex. 1, at 2; Ex. 3, (Howenstine Depo., 14:2).

It has a loyal following in part because of its simple and natural non-beef ingredients. *See* Ex. 1, at 2.  For example, Gardenburger's "The Original" veggie burger is primarily made from mushrooms, onions, brown rice, rolled oats, bulgur, mozzarella cheese, cheddar cheese, and parsley.  *See* Ex. 4.  Gardenburgers also contain soybean fiber or soy protein as ingredients to add texture and boost the fiber and protein content of the burger.  Ex. 5; Ex. 3, (Howenstine Depo., 46:8-21).

Notably, hexane is *not* an ingredient in any Gardenburger product. Hexane is a processing aid used in some Gardenburgers to help extract protein from soybeans, and it does not remain in the finished product.  *See* Ex. 3, (Howenstine Depo., 51:12-14, 52:13-16, 80:19-81:1). As Leigh-Ann Howenstine, a Kellogg Senior Product Development Scientist, testified at deposition, "what you have after the process is soy protein.  That's it." Ex. 3, (Howenstine Depo., 55:20-21); *see also* Ex. 2 (Neely Depo., 95:2-5).

## II.     Consumers Purchase Gardenburger Products for a Variety of Reasons.

In 2012, Joe Kramer, then the Gardenburger brand manager at Kellogg, commissioned a marketing research study to better understand what consumers thought about Gardenburgers.  *See* Ex. 2, (Neely Depo., 82:8-83:2); Ex. 6.  The in-depth study, which was conducted by an independent consulting firm, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



These findings are consistent with Kellogg's own understanding that the "Made with Natural Ingredients" label ▮▮▮▮▮▮▮▮▮▮▮▮▮ as explained by Kirsten Neely, a senior manager at Kellogg. Ex. 2 (Neely Depo., 93:7-17). For this reason, that statement was removed from Gardenburger products when the packaging was redesigned in 2016. Ex. 2 (Neely Depo., 31:1-24). The phrase "Made with Natural Ingredients" thus appeared on the packaging of some Gardenburgers for only between July 2010 and January 2016. The design of the new packaging highlights taste and texture, ▮▮▮▮▮▮▮▮▮ ▮▮▮▮ Ex. 2 (Neely Depo., 92:8-15; 93:7-17).

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ have been corroborated by a test-and-control survey conducted by Dr. Itamar Simonson, the Sebastian S. Kresge Professor of Marketing at Stanford University's Graduate School of Business. Dr. Simonson is one of the country's top marketing and consumer behavior experts. He has been a finalist or winner of the O'Dell Award in 1995, 2001, 2002, 2004, 2005, 2007, 2008, and 2012 (the O'Dell Award is given by the *Journal of Marketing Research*, the major journal on

marketing research, for the article with the greatest impact on marketing in the past five years). Simonson Report, ¶ 3.

Dr. Simonson oversaw a survey that asked over 400 California consumers, all of whom purchased veggie burgers during the six months preceding the survey and/or expected to purchase veggie burgers during the subsequent six months, about Gardenburgers. He designed a test-and-control survey in which one set of consumers were shown the Gardenburgers *with* "Made with Natural Ingredients" on the packaging (the test group) and another group of consumers who saw Gardenburgers *without* "Made with Natural Ingredients" (the control group). *See id.* ¶ 12. Both groups were asked the same set of questions, which were open-ended to avoid potential biases. *See id.* ¶¶ 32, 43.

Of the 400+ survey respondents, only *two* respondents — 0.5% of the survey participants — even mentioned the word "natural" as one of the reasons that they bought Gardenburgers. *See id.* ¶ 34. The top reasons for buying Gardenburgers were taste/flavor, prior experience, and price. *See id.* Further, the responses between the test and control groups were strikingly similar. For example, there was no statistically significant difference in the price that the test and control groups said that they would pay for Gardenburgers. *See id.* ¶ 37 (noting that both test and control groups' responses had a median of $4.91).

Based on these results, Dr. Simonson concludes that the "appearance of the term 'Made with Natural Ingredients' on the packaging does not affect (a) purchase likelihood, and (b) the price that consumers are willing to pay for the product." *See id.* ¶ 42. Further, he noted that the survey results showed "great variability across consumers with respect to purchase criteria and facts that affect their purchase intentions." *See id.*

## III. Regulatory Agencies and Consumers Focus on Ingredients in Determining Whether a Food Product is "Natural."

Consumers, courts, and regulatory agencies agree that "natural" is an ambiguous term. As the U.S. Food and Drug Administration ("FDA") explained in 2015, "the term 'natural' is used on a variety of products to mean a variety of things," and there is "evidence

that consumers regard many uses of this term as non-informative." *Use of the Term "Natural" in the Labeling of Human Food Products; Request for Information and Comments*, 80 Fed. Reg. 69905, 69906 (Nov. 12, 2015).

Although the FDA has yet to define "natural," its longstanding policy for the use of the term on food labels is that "natural" means no added color, synthetic substances, or flavors. *Id.* Put another way, the FDA considers "natural" to mean that no artificial or synthetic *ingredients* are "included in, or ha[ve] been added to, the product that would not normally be expected to be there." *Id.* The FDA's policy does not "explicitly address food processing or manufacturing methods, such as thermal technologies, pasteurization, or irradiation." *Id.*

Similarly, the U.S. Department of Agriculture's ("USDA") policy on the use of "natural" on meat and poultry products requires that the product have "no artificial *ingredient* or added color" and be "only minimally processed." *Meat and Poultry Labeling Terms*, USDA Food Safety and Inspection Service, available at https://www.fsis. usda.gov/wps/portal/fsis/topics/food-safety-education/get-answers/food-safety-fact-sheets/ food-labeling/meat-and-poultry-labeling-terms/meat-and-poultry-labeling-terms.

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████ Ex. 7 ; Ex. 3 (Howenstine Depo., 37:22-38:2, 45:12-23); Kellogg's Response to Interrogatory No. 2.

## ARGUMENT

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rather, the plaintiff must provide "evidentiary proof"

that the class meets the prerequisites of Rule 23(a) and at least one of the provisions of Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). A court's class certification analysis must be "rigorous," and will frequently overlap with the merits of plaintiffs' underlying claim. *In re Banc of California Sec. Litig.*, -- F. Supp. 3d --, 2018 WL 3868922, at *2 (C.D. Cal. May 31, 2018).

## I. Plaintiff's Bare-Bones Conjoint Damages Model Does Not Pass Muster Under the "Rigorous Analysis" Requirement of *Comcast Corp. v. Behrend*.

In *Comcast v. Behrend*, the Supreme Court made clear that a party seeking class certification bears the burden of "establishing that damages are capable of measurement on a classwide basis." 569 U.S. at 34. Specifically, the court "must conduct a 'rigorous analysis' to determine whether" the proposed damages model (1) is "consistent with its liability case," and (2) will permit "measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* at 35. Therefore, "a model purporting to serve as evidence of damages in [a] class action must *measure only those damages attributable* to" the plaintiff's theory of liability. *Id.* (emphasis added). Put another way, Plaintiff's damages model must show that it can accurately isolate the alleged price premium "attributable" to "Made with Natural Ingredients." Her opinion does not meet either the *Comcast* or *Daubert* standards.

## A. Dr. Howlett's Proposed Conjoint Model Is Woefully Underdeveloped.

Dr. Howlett's proposed conjoint analysis is so cursory that it is virtually impossible to determine whether it is even capable of measuring the supposed price premium charged by Kellogg for the statement "Made with Natural Ingredients," as required under *Comcast.* Her expert report does not offer any details or even a basic design of how she would develop a model to calculate classwide damages.

In construing *Comcast*'s "rigorous analysis" requirement for class-wide damages model, federal courts have consistently held that the proposed damages model must be sufficiently developed to show that it is capable of measuring class-wide damages. A mere rough sketch of a future conjoint analysis will not suffice: a proposed analysis in a

"relatively undeveloped state" cannot meet a plaintiff's burden of showing that she can measure damages on a class-wide basis. *See Miller v. Fuhu*, No. 14-6119, 2015 WL 7776794, at *22 (C.D. Cal. Dec. 1, 2015).

Numerous courts have denied bids for class certifications where the plaintiff's damages model lacked sufficient details to show how she would isolate the price premium, as required by *Comcast*. For example, in *In re ConAgra Foods, Inc.*, 302 F.R.D. 537 (C.D. Cal. 2014), the district court found plaintiffs could not meet their burden of showing damages were measurable on a class-wide basis where the proposed analysis did not contain the relevant data or variables. At issue was the alleged "price premium" paid as a result of a "100% All Natural" claim on food labeling. *Id.* at 550. The *ConAgra* court noted that although the proffered expert described in detail the methodology behind conjoint analysis, he "d[id] not actually perform either analysis or describe in any detail their specific application to this case." *Id.* The court took particular issue with the fact that the expert stated that the data necessary to conduct the conjoint analysis were "easily obtainable", but the expert had not obtained or identified them. *Id.* The court thus held that plaintiffs could not meet their burden of showing damages could be measured on a class-wide basis. "Although the methodologies [the expert] describes may very well be capable of calculating damages in this action, [he] has made no showing that this is the case." *Id.* at 552.

Additionally, in *Werdebaugh v. Blue Diamond Growers*, No. 12-2724, 2014 WL 7148923, at *11 (N.D. Cal. Dec. 15, 2014), the court rejected a proposed damages model where some details were provided, but there were holes in the proposed analysis. Specifically, the proffered expert came up with certain brand variables but omitted others without explanation. This insufficient explanation, and ultimately undeveloped model, could not support the plaintiff's attempt at class certification. *Cf. also Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) (noting that in some cases an expert's conjoint analysis may be "so incomplete as to be inadmissible as irrelevant").

Even more so than in *ConAgra* and *Werdebaugh*, Dr. Howlett's proposed conjoint

analysis is so sparse and inadequate that this Court must reject it. She merely provides a few pages of generalized and vague descriptions of what a conjoint analysis is, *i.e.*, a survey methodology that tests several attributes of a product to determine consumers' relative preferences among those chosen attributes. But Dr. Howlett's expert report provides almost no details or even a design regarding how she would try to measure the supposed price premium for the "Made with Natural Ingredients" claim. For example, she emphasizes the importance of selecting "realistic" attributes of a product that will be included and tested in a conjoint survey. Howlett Report, Dkt. No. 66-3, ¶ 36. At her deposition, however, she admitted that she did not know what attributes she would even test to try to measure the price premium of "Made with Natural Ingredients." Ex. 10 (Howlett Depo., 52:15-23) ("Q: [W]hat would [the] six attributes [of your conjoint survey] be? A: . . . I was just asked sort of to opine on this . . . You know, this was just kind of thrown out there as a ballpark. I'm not really sure.").

Even though a choice-based conjoint is intended to capture consumers' relative decision-making preferences for particular attributes of a product, Dr. Howlett conceded in her deposition that she lacks the knowledge of what drives consumer decision-making in the vegetarian food market:

> Q: Have you studied the vegetarian packaged foods market before?
>
> A: No.
>
> Q: Do you know what factors consumers would consider in buying packaged vegetarian food product?
>
> A: I would have to do some research.

*Id.* at 44:1-7.

Ultimately, Dr. Howlett's defense was that she would at some later point conduct further research to better understand the products and issues involved in this case, and then devise a damages model that could measure the price premium. As she put it, "I'm not an expert on the vegetarian market, and I'd want to look more closely, more thoroughly before

I actually designed the research, look at more information about the drivers of choice within the vegetarian market, as well as the natural market, and develop a more thorough understanding than that." *See id.* at 53:2-56:8. But like the court in *ConAgra*, which sharply criticized the proffered expert's failure to collect the necessary data before presenting the proposed model, the Court here should reject Dr. Howlett's damages model. *See* 302 F.R.D. at 550. And further, under *Comcast*, a plaintiff must provide that detailed damages model at the class certification stage, not at trial or some other future date. 569 U.S. at 35 (stating that while calculations in a proposed model need not be exact, "at the class-certification stage . . . any model supporting a plaintiff's damages case must be consistent with its liability case"); *see also Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 379 (N.D. Cal. 2010) ("At class certification, plaintiff must present a *likely* method for determining class damages") (emphasis added).

In short, Dr. Howlett's bare-bones sketch of her proposed conjoint analysis cannot meet the "rigorous analysis" standard required in *Comcast*. *See* 569 U.S. at 35.

### B. The Few Details in Her Proposed Conjoint Analysis Reveal Fundamental Flaws in the Design and Methodology.

Even if this Court accepted the scant details about Dr. Howlett's proposed conjoint analysis as sufficient, those few nuggets of analysis in her expert report suffer from such severe flaws that her proposed conjoint cannot measure the supposed price premium attributable to the challenged statement.

As Dr. Howlett correctly states, the choice sets of different attributes in a conjoint must be carefully selected to "reflect realistic (as opposed to absurd) choices," and to avoid tipping-off participants to the actual purpose of the study. Howlett Report, ¶ 36. Moreover, she emphasized that the "included attributes should be independent of each other, as overlapping attributes can skew results." Howlett Report, ¶ 36. As she explained in her deposition, it would be a mistake, for example, to include horsepower and miles-per-gallon as attributes in a conjoint survey about the value of car attributes because they are "inversely

related." Ex. 10 (Howlett Depo., 34:11-22).

Yet her proposed conjoint survey for this case appears to violate every single one of these design principles. In her expert report, she suggests that the attributes she would test to figure out the price premium for "Made with Natural Ingredients" may be six varying definitions of "natural" (*e.g.*, "no pesticides," "no artificial flavors," "no artificial colors," "no preservatives," and "no GMOs."). *See* Howlett Report, ¶¶ 41-44. But as Dr. Ronald Wilcox — the NewMarket Corporation Professor at the University of Virginia's Darden Graduate School of Business Administration and an expert on conjoint analysis — explains in his expert report, this "goes against the basic principles of conjoint survey design" and is "not only unrealistic" but "also absurd." Wilcox Report, ¶ 19. He explains that a proper conjoint survey would test "other important factors that consumers consider when purchasing veggie burgers" (such as taste or texture) to try determine what value consumers place on each of these important attributes. *Id.* at ¶ 20. But Dr. Howlett's proposed conjoint survey ignores all of these attributes, and instead will apparently ask consumers about six varying definitions of "natural."

Further, by selecting six different claims related to "natural" as attributes to be tested in her conjoint survey, Dr. Howlett would be clearly "tipping off" the survey respondents to the purpose of the conjoint survey. Wilcox Report, ¶ 20 ("Demand artifacts arise in a survey when respondents are able to guess the purpose of the survey and provide responses that they think are expected, thus leading to biased responses."). The focus on "natural" attributes would also lead to a cognitive bias known as "focusing illusion," artificially inflating the importance that respondents ascribe to "natural," yielding unreliable results. Wilcox Report, ¶ 20. And by testing only six varying definitions of "natural" (instead of other attributes), these "overlapping attributes" would "skew results," as Dr. Howlett warned herself. Howlett Report, ¶ 36.

Accordingly, Dr. Wilcox concludes that Dr. Howlett's proposed survey "fails to follow fundamental conjoint survey design principles" and would not lead to an accurate

price premium. Wilcox Report, ¶ 12. In false advertising cases seeking "price premium" damages, district courts have consistently held that a plaintiff's proposed damages model is inconsistent with her theory of liability under *Comcast* if it "overvalu[es] . . . the price premium attributable to the alleged misrepresentation." *Hughes v. Ester C Co.*, 317 F.R.D. 333, 356 (E.D.N.Y. 2016); s*ee also*, *e.g.*, *Werdebaugh v. Blue Diamond Growers*, No. 12-2724, 2014 WL 7148923, at *12 (N.D. Cal. Dec. 15, 2014) (rejecting plaintiff's proposed damages model under *Comcast* because its failure to control for advertising rendered it "unable to determine how much of the purported price premium is due to Defendant's use of the at-issue labeling claims, as opposed to Defendant's successful advertising campaigns or promotions."). And her flaws in her conjoint design will render inaccurate price premium results and will thus not be consistent with Plaintiff's theory of liability under *Comcast*.

### C. A Conjoint Analysis Cannot Calculate a Price Premium Because It Only Measures a Consumer's Willingness-to-Pay.

Even assuming for argument's sake that Dr. Howlett's conjoint analysis was sufficiently detailed, it would still fall short under *Comcast* for yet another reason: a conjoint analysis, by definition, only measures a consumer's willingness-to-pay (*i.e.*, demand) and does not take into account supply-side and market-based factors that set a price of a product.

The Supreme Court made clear in *Comcast* that "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to" the plaintiff's theory of liability. 569 U.S. at 35. Under California law, the measure of damages in false advertising cases is limited to the "price premium" attributable to the challenged misrepresentation. *Brazil v. Dole Packaged Foods, LLC*, 660 F. App'x 531, 534 (9th Cir. 2016) (holding that damages must be "limited . . . to the difference between the prices customers paid and the value of the [product] they bought").

Contrary to her assertions, Dr. Howlett's proposed conjoint analysis is not capable of measuring the alleged price premium charged by Kellogg for the "Made with Natural Ingredients" label. As Dr. Wilcox explains, a conjoint analysis can only measure an

estimation of consumers' willingness-to-pay for a particular attribute (*i.e.*, demand). *See* Wilcox Report, ¶ 13. But market prices are set by supply *and* demand. In other words, just because a consumer is willing to pay "x" amount for an attribute does not mean that a company can or will charge that "x" amount due to market-based factors, such as pricing strategy, competition, and a host of other supply-side reasons.

A conjoint analysis, by its nature, looks at demand-side factors only to identify consumers' preferences for certain product attributes. Wilcox Report, ¶ 21. But determining market price premiums "is outside the realm of what conjoint analysis can deliver." Wilcox Report, ¶ 21. To calculate a price premium, supply-side and market factors, such as production costs, availability of competitor products, distribution costs, and existing supply agreements with retailers, must be taken into account. Wilcox Report, ¶¶ 21-22. Conjoint analysis cannot do so. Further, conjoint analysis cannot determine the "counterfactual" price that would have existed but for the challenged claims appearing on labeling — a value necessary for determining a "price premium." Wilcox Report, ¶ 22. As Dr. Howlett conceded at her deposition, the price of a product is "a very complicated question" and is influenced by a variety of factors, including "the cost of goods," the "positioning" of the product in the marketplace (*e.g.*, whether the product is a luxury good), and the competition. Ex. 10, Howlett Depo., 42:17-43:3. Since these supply side factors are "absent from conjoint analysis," Dr. Howlett's proposed model is "incapable of predicting market outcomes, and in particular, counterfactual equilibrium prices." Wilcox Report, ¶ 22.

For this reason, several courts have rejected attempts to use conjoint analysis to calculate price premium damages. In *Apple, Inc. v. Samsung Elecs. Co.*, the court concluded that conjoint analysis cannot measure the price premium associated with certain features on a tablet or smartphone because it "does not account for supply at all, much less the real-world intersection of market demand and market supply[.]" No. 11-01846, 2014 WL 976898, at *11-12 (N.D. Cal. Mar. 6, 2014). As the court put it, there is no "dispute that

the ultimate price of a product is a *combination* of market demand and market supply." *Id.* at *11 (emphasis added).

Similarly, in *In re NJOY, Inc. Consumer Class Action Litig.*, the court held that plaintiffs' proffered conjoint analysis model "d[id] not satisfy *Comcast*" because it failed to quantify the "price premium" they paid due to allegedly misleading advertising for e-cigarettes. 120 F. Supp. 3d 1050, 1119–20 (C.D. Cal. 2015). The court rejected conjoint analysis as "provid[ing] only a model for testing what a consumer is willing to pay, without considering other factors in a functioning marketplace." *Id.* at 1119; *see also In re NJOY, Inc. Consumer Class Action Litig.*, No. 14-428, 2016 WL 787415, at *7 (C.D. Cal. Feb. 2, 2016) (rejecting motion for reconsideration because the revised conjoint analysis model "still only look[ed] to the demand side of the market equation, and ignore[d] the price at which NJOY, and other e-cigarette manufacturers, would be willing to sell their products.").

Likewise here, Dr. Howlett's proposed conjoint analysis "look[s] only to consumer demand while ignoring supply," and thereby "converts the lost-expectation theory from an objective evaluation of relative fair market values to a seemingly subjective inquiry of what an average consumer wants." *See Saavedra v. Eli Lilly & Co.*, No. 12-9366, 2014 WL 7338930, at *5 (C.D. Cal. Dec. 18, 2014) (denying certification because plaintiffs' proposed conjoint analysis model was "inadequate" to calculate damages on a classwide basis).

### D. Dr. Howlett's Analysis Fails the *Daubert* Standard.

Dr. Howlett's expert report also must be excluded under *Daubert*. The proponent of expert testimony "has the burden of *proving* [its] admissibility." *Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996) (emphasis added). To satisfy this burden, the party must show that the analysis is "based on sufficient facts or data" and that it is "the product of reliable principles and methods" that the expert has "reliably applied . . . to the facts of the case." Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Rule 702 and *Daubert* impose "exacting standards of reliability[.]" *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000).

As noted above, Dr. Howlett's opinions on conjoint analysis and materiality of "Made with Natural Ingredients" are not based on sufficient facts or data. She admitted that she knows virtually nothing about vegetarian food products, and does not know even basic facts such as factors that consumers consider in buying them. Ex. 10 (Howlett Depo., 44:1-7). As a result, she did not even know what product attributes she would test for her proposed conjoint. *Id.* 52:15-23. Nor did she cite any internal Kellogg documents in her report, including an internal study that shows ████████████████████████████ ████████. *See* Exs. 6 and 9. And she admitted that she did not know if the challenged term ("Made with Natural Ingredients") has the same meaning as "natural," and that it would need to be tested (which she did not do). Ex. 10 (Howlett Depo., 46:6-14). This complete failure to consider basic facts in her opinion render it inadmissible under *Daubert*. *See*, *e.g.*, *Hemmings*, 285 F.3d at 1174 (9th Cir. 2002) (noting that in some cases an expert's conjoint analysis may be "so incomplete as to be inadmissible as irrelevant"); *Younan v. Rolls-Royce Corp.*, No. 09-2136, 2013 WL 1899919, at *17 (S.D. Cal. May 7, 2013) (granting motion to exclude expert testimony because plaintiffs "failed to establish that [the expert] had adequate factual support or other foundation to form the opinions challenged by [defendants]").

Notably, this Court recently struck part of Dr. Howlett's opinion in a different case because her opinion was not based on "sufficient facts or data," and instead purported to rely on "common knowledge" instead. *Clay v. Cytosport, Inc.*, No. 15-000165, Dkt. No. 210 (S.D. Cal. Sep. 7, 2018) (J. Lorenz); *see also Shirar v. Guerrero*, No. 13-906, 2017 WL 6001270, at *7 (C.D. Cal. Aug. 2, 2017) (finding that expert's opinions "lack[ed] a sufficient factual basis and [were] thus unreliable" because they were "based, at least in part, on unsupported evidentiary assumptions.").

Further, as demonstrated above, Dr. Howlett's rough sketch of her proposed conjoint survey suffers from fundamental flaws that render it wholly unreliable. Indeed, as Dr. Wilcox points out, her proposed survey design violates the basic principles — careful

selection of attributes, avoidance of interrelated attributes, realistic presentation, etc. — that she claims are important in designing a conjoint. *Supra* § I (C). Further, as Dr. Wilcox explains, her proposed conjoint cannot reliably measure price premium because it only isolates a willingness-to-pay (demand) for an attribute and does not take into account supply-side and market-based factors that affect a product's price. *Supra* § I (C). Accordingly, her proposed conjoint is not a reliable methodology to measure price premium.

## II. The Proposed Class Cannot be Certified Because Individual Issues Predominate Over Common Ones.

Under Rule 23(a)(2), a plaintiff must show that "there are questions of law or fact common to the class." *Dukes*, 564 U.S. at 349. This requires that the claims of the entire putative class "depend upon a common contention" that can be resolved on a classwide basis in "one stroke." *Id.* at 350. Further, a plaintiff must satisfy the "even more demanding" predominance requirement. *Behrend*, 569 U.S. at 34. Under Rule 23(b)(3), a plaintiff must show that "questions of law or fact common to class members predominate over any questions affecting only individual members." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).

### A. Individual Issues Predominate Because Consumers Have Widely Divergent Understanding of "Made with Natural Ingredients."

Class certification is improper where the plaintiff fails to "present[] sufficient evidence to support a conclusion that the challenged statements were actually false as applied to all (or even most) classmembers." *Konik v. Time Warner Cable*, No. 07-763, 2010 WL 8471923, at *9 (C.D. Cal. Nov. 24, 2010). Where measuring the truth or falsity of the challenged statement "is a subjective exercise . . . it is hard to see how Plaintiffs' complaints could be common to or representative of the alleged class." *In re Clorox Consumer Litig.*, No. 12-00280, 2013 WL 3967334, at *4 n.4 (N.D. Cal. July 31, 2013). Put another way, a court will have to engage in highly individualized inquiries into each person's understanding of a challenged term if it has varying meaning across the class.

In this case, Plaintiff asserts that the "Made with Natural Ingredients" label on Gardenburger products is deceptive because hexane (which does not remain in the final product) was used as a processing aid. *See* Mot., at 1. But as the FDA and courts across the nation have repeatedly stated, the term "natural" is ambiguous and inherently subjective. Depending on the context, "natural" can "mean a variety of things." 80 Fed. Reg. at 69906; *see also Pelayo v. Nestle USA, Inc.*, 989 F. Supp. 2d 973, 979 (C.D. Cal. 2013) (explaining that "natural may be used in numerous contexts and may convey different meanings depending on that context."); *Kelly v. Cape Cod Potato Chip Co.*, 81 F. Supp. 3d 754, 760 (W.D. Mo. 2015) ("The term 'natural' is 'vague and ambiguous.'") (citation omitted).

For this reason, the "Made with Natural Ingredients" label may be understood differently by different people:

- Many consumers will believe that the "Made with Natural Ingredients" means what it says: all of the ingredients are natural. And that is true for Gardenburger, as all of the ingredients (*e.g.*, mushrooms, onions, brown rice, rolled oats, mozzarella cheese, cheddar cheese, and parsley) are indeed natural. *See* Ex. 4. As the ingredient list on the packaging reflects, there are no artificial ingredients in Gardenburgers. Hexane is not an ingredient, and is a mere processing aid that does not remain in the final Gardenburger. *See* Ex. 3, (Howenstine Depo., 51:12-14, 52:13-16, 55:20-21; 80:19-81:1); *see also* Ex. 2 (Neely Depo., 95:2-5).

- Some consumers will agree with the USDA's understanding of "natural." ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ Ex. 7; Ex. 3 (Howenstine Depo., 37:22-38:2, 45:12-23) (noting that the soy ingredients used in Gardenburger are sourced from Solae). Notably, Plaintiff acknowledged that she would believe it is acceptable for Gardenburger to be labeled as "natural" if the product met the USDA's guidelines for the term. Ex. 8 (Mohamed Depo., 54:3-11).

- Some consumers will believe that the "Made with Natural Ingredients" label is accurate because they understand "natural" to mean "minimal processing." For these consumers, Gardenburger veggie burgers are natural because ██████████ ██████████████████████████████████████████████████ Ex. 6, at 54, 55, 57 (██████████████████████████████████████████████████ ██████████████████████████████████████████).

- A few people, like Plaintiff, will take a hardline position that "natural" means no processing whatsoever. But in the context of packaged frozen food products, this viewpoint is an outlier. As courts have recognized, reasonable consumers are acutely aware that packaged foods, like pastas and potato chips (or veggie burgers) do not spring full-formed from trees and bushes, but are "manufactured in mass." *Pelayo*, 989 F. Supp. 2d at 978; *Kelly*, 81 F. Supp. 3d at 60.

Given this lack of uniformity in how consumers understand the term, courts have routinely denied attempts to certify a class based on "natural" labeling. In *Jones v. ConAgra Foods, Inc.* the court denied certification in a case challenging a "100% Natural" label on Hunt's canned tomato products in part because "there is no single, controlling definition of the word 'natural.'" No. 12-01633, 2014 WL 2702726, at *15 (N.D. Cal. June 13, 2014). As the court explained, individual questions of reliance predominate because "consumers' *understanding* of th[e] representations" are not uniform. *Id.* at *14 (emphasis in original).

Similarly, in *Randolph v. J.M. Smucker Co.*, the court noted the "lack of consensus" in how consumers interpret the term "natural" in denying class certification in a case challenging an "All Natural" label on Crisco cooking oils. 303 F.R.D. 679, 695–96 (S.D. Fla. 2014). In light of the ambiguity surrounding the term, the court found that "any predominant issues succumb to individualized issues of fact, namely, whether the individual believes a product labelled as 'All Natural' . . . is indeed not 'all natural.'" *Id.* at 696.

The same result is required here. With no uniform definition of "natural" (let alone "Made with Natural Ingredients"), this Court will be forced to conduct individualized

inquiries into each putative class member's subjective understanding of the term, and whether the Gardenburger products are consistent with that understanding.

Moreover, Plaintiff has not provided *any* evidence, such as a consumer survey or expert testimony, showing that objectively reasonable consumers would agree with her understanding of "Made with Natural Ingredients." This failure alone is sufficient to preclude class certification. *See Briseno v. ConAgra Foods, Inc.*, 674 F. App'x 654, 656 (9th Cir. 2017) (explaining that plaintiffs "must" provide evidence of materiality and reasonable consumers' understanding of the challenged "100% Natural" label); *Kosta v. Del Monte Foods, Inc.*, 308 F.R.D. 217, 230 (N.D. Cal. 2015) (denying class certification for lack of commonality where plaintiffs "offer[ed] no method of classwide proof to show that a 'reasonable consumer' would find the challenged statements deceptive and material to their purchasing decision."); *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1045-46 (C.D. Cal. 2018) (denying class certification where Plaintiffs provided no evidence establishing that the challenged statement has a "common meaning").

### B. Individual Issues Predominate Because Consumers Buy Gardenburgers for Widely Differing Reasons.

In false advertising cases, class certification is improper absent "some means of proving materiality and reliance by a reasonable consumer on a classwide basis[.]" *Kosta*, 308 F.R.D. at 225 (denying certification of UCL and CLRA claims). But "'if the issue of materiality or reliance is a matter that would vary from consumer to consumer, the issue is not subject to common proof, and the action is properly not certified as a class action.'" *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 453 (S.D. Cal. 2014) (denying UCL and CLRA claims and quoting *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 129 (2009)).

Here, there is little evidence that most, or even some consumers, buy Gardenburgers because of the "Made with Natural Ingredients" statement. To the contrary, the evidence in the record confirms that other factors are driving sales of Gardenburger products.

- First, Kellogg's internal marketing studies show ███████████████████████
  ███████████████████████████████████████████████████████████████████

- Second, Plaintiff's own testimony casts doubt on her claim that "Made with Natural Ingredients" is material. Plaintiff testified that she grew up eating Gardenburger with her parents and that she bought Gardenburger for herself as soon as she started earning her own money as a teenager. Ex. 8 (Mohamed Depo., 37:5-11; 59:23-60:4; 69:2-6). From 1992 through approximately 2013, Plaintiff purchased Gardenburger products about once a week. Ex. 8 (Mohamed Depo., 60:10-18). Plaintiff's purchasing habits did not change after the "Made with Natural Ingredients" label was introduced in 2009. *See* Ex. 2 (Neely Depo., 23:19-24:3). And despite being a frequent Gardenburger purchaser for over two decades, Plaintiff had a hard time spotting the label when shown the packaging in deposition. *See* Ex. 8 (Mohamed Depo., 65:1-3; 71:17-23) ("Q: Do you recall seeing the 'made with natural ingredients' on top when you bought Gardenburger? A: I don't remember."). Plaintiff also testified that she loved the taste of Gardenburger and the fact that it kept her feeling full. *See* Ex. 8 (Mohamed Depo., 60:19-24).

- Third, Kristen Neely, a Kellogg senior manager, testified that when the packaging for Gardenburger products was redesigned from a box-and-bag to a resealable bag in 2016, the "Made with Natural Ingredients" label was removed

Ex. 2 (Neely Depo., 92:8-15; 93:7-17).

- Fourth, Dr. Simonson's survey revealed that only 0.5% of 400+ respondents even mentioned "natural" as one of the reasons for buying Gardenburgers. Simonson

Report ¶ 34.  The top reasons offered were taste/flavor, prior experience, and price.  *See id.*

Faced with this evidence that "Made with Natural Ingredients" is not a factor for most consumers, Plaintiff primarily relies on an out-of-context quote lifted from a Kellogg sales brochure targeted at food service operators.  *See* Mot. at 11, Smith Decl., Ex. E. The sales brochure states that restaurants offering organic and natural meal options may be able to charge more and earn more profit.  *See* Smith Decl., Ex. E.  That sales pabulum directed at corporate cafeterias has little bearing on what individual consumers think, let alone a class of consumers.

Plaintiff also relies on Dr. Howlett's expert report to claim that "Made with Natural Ingredients" is material to consumers class-wide. But Dr. Howlett did not conduct a consumer survey, but instead merely opined that "Made with Natural Ingredients" is material. Given that Dr. Howlett admitted that she has not studied the vegetarian food market and in fact does not even know "what factors consumers would consider in buying a packaged vegetarian food product" (Ex. 10 (Howlett Depo., 44:1-7)), her mere say-so should carry little weight. [2]

As the Ninth Circuit explained, if there are multiple reasons for a consumer buying and using a particular product, it is improper to certify a class because "all of those people [who acted for different reasons] would [be] swept willy-nilly into the class." *See Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1024 (9th Cir. 2011) (abrogated on other grounds by *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)).  This is exactly the case here.  *See Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d at 1047 (denying class certification where plaintiffs failed to show that the challenged statement "factored into consumers'

---

[2] Dr. Howlett's report cites generic survey questions about the term "natural," but they have minimal relevance here because they did not involve the term "Made with Natural Ingredients" or vegetarian food products. She admitted that she did not know if "Made with Natural Ingredients" has the same meaning as "natural," and said that it would need to be tested (which she did not do).  Ex. 10 (Howlett Depo., 46:6-14).

purchasing decision on a classwide basis.").

Many federal district courts in the Ninth Circuit have denied class certification where there was little evidence that the term "natural" was material to most consumers. For example, in *In re Hain Celestial Seasonings Prod. Consumer Litig.*, the court denied certification of a Rule 23(b)(3) class because plaintiffs could not show that the challenged "100% Natural" label was material to consumers when purchasing Celestial Seasonings teas. No. 13-1757, 2015 WL 12001273, at *9-10 (C.D. Cal. Sept. 23, 2015). In light of evidence that the natural label was just "one of many factors at play when choosing to drink tea, and that it consistently ranks below several other factors", the court concluded that determining which class members relied on the "100% Natural" label "would have individual questions predominating." *Id.* at *10.

And in *Jones v. ConAgra*, the court relied on similar reasoning to conclude that plaintiffs could not establish the materiality of "100% Natural" on a classwide basis. 2014 WL 2702726, at *16-17. The court explained that "there are numerous reasons a customer might buy Hunt's tomatoes, and there is a lack of evidence demonstrating the impact of the challenged label statements." *Id.* at *16; *see also Algarin*, 300 F.R.D. at 457 (finding that there was no predominance where the evidence showed that "varying factors . . . influence purchasing decision[s] and[] consumer satisfaction").

As in *Hain Celestial*, *Jones*, and *Algarin*, Plaintiff's bid for class certification should be denied because the evidence shows that people buy Gardenburgers for a multitude of reasons unrelated to the statement "Made with Natural Ingredients."

### III. Plaintiff Is Not an Adequate or Typical Class Representative Because Her Lack of Reliance on the Challenged Term Will Become a Focus of the Trial.

Rule 23(a)'s typicality and adequacy requirements "assure that the interest of the named representative aligns with the interests of the class." *Hanon*, 976 F.2d at 508. Class certification "is inappropriate where a putative class representative is subject to unique defenses which *threaten* to become the focus of the litigation." *Id.* (emphasis added).

Critically, the Ninth Circuit in *Hanon* made clear that the defendant need not show that it will *prevail* on those unique defenses; rather, if there is a mere "danger" that the plaintiff will be "preoccupied with defenses unique to it," then she is not an adequate or typical class representative. *Id. See also*, *e.g.*, *Yoon v. Gap, Inc.*, No. 08-5712, 2010 WL 11597565, at *5 (C.D. Cal. Oct. 6, 2010) (citing *Hanon* and holding that it does not matter "[w]hether or not these defenses would ultimately be found to have merit" for purposes of determining the adequacy and typicality of a class representative as long as "there is certainly a danger present that Plaintiff will be preoccupied with rebutting these relevant defenses").

That "danger" of "unique defenses" will lurk throughout the trial in this case. Kellogg will argue vigorously at trial that Plaintiff lacks standing because she cannot show she relied on "Made with Natural Ingredients" in purchasing Gardenburger products. As a devoted vegetarian, Plaintiff began purchasing Gardenburger products over *17 years* before the "Made with Natural Ingredients" label was introduced in 2009. *See* Ex. 2 (Neely Depo., 23:19-24:3). Plaintiff grew up eating a primarily vegetarian diet and was regularly given Gardenburger foods by her parents. Ex. 8 (Mohamed Depo., 37:5-11; 69:2-6). She began purchasing Gardenburgers for herself as soon as she started earning her own money as a teenager. Ex. 8 (Mohamed Depo., 59:23-60:4). From the time she left for college in 1992 through approximately 2013, Plaintiff purchased Gardenburger products on a weekly basis. Ex. 8 (Mohamed Depo., 60:10-18). For the majority of this time period, during which her habit of purchasing Gardenburger products was formed, the "Made with Natural Ingredients" statements did *not* appear on labels.

Notably, Plaintiff's purchasing habits did not change at all after the "Made with Natural Ingredients" label was introduced. *See* Ex. 2 (Neely Depo., 23:19-24:3). At deposition, Plaintiff could not recall seeing "Made with Natural Ingredients" when purchasing Gardenburger products, and even had trouble differentiating packaging with the label from packaging without it when they were presented to her. Ex. 8 (Mohamed Depo.,

65:1-3; 71:17-23). It is clear from Plaintiff's deposition testimony that she was a loyal Gardenburger customer for over two decades because she loved its taste, flavor, and the fact that it kept her feeling full. *See* Ex. 8 (Mohamed Depo., 60:19-24).

Kellogg will argue at trial that Plaintiff did not rely on the challenged statement in making her Gardenburger purchases, and that she lacks both Article III and statutory standing. *See Joseph v. Costco Wholesale Corp.*, No. 14-06899, 2015 WL 12745803, at *6 (C.D. Cal. Aug. 27, 2015) (holding that plaintiff lacked standing "[b]ecause . . . he did not rely on the 'Apotex USA Inc.' statement when purchasing the atorvastatin at issue."). And for this reason, she is necessarily atypical of the putative class and cannot serve as the class representative. *See*, *e.g.*, *Backus v. ConAgra Foods, Inc.*, No. 16-454, 2016 WL 7406505, at *4-5 (N.D. Cal. Dec. 22, 2016) (holding that named plaintiff was "decidedly atypical" when his purchasing history exposed him to "unique challenges . . . regarding his credibility and motives"); *In re AutoZone, Inc., Wage & Hour Empl. Practices Litig.*, 289 F.R.D. 526, 547-48 (N.D. Cal. 2012) (denying certification of subclass because plaintiff's lack of standing meant she did not satisfy the typicality requirement); *Jones v. ConAgra Foods, Inc.*, No.12-01633, 2014 WL 2702726, at *7 (N.D. Cal. June 13, 2014) (holding that plaintiff was not typical because she "was not deceived by the challenged statements"). In short, this "danger" that Plaintiff's unique history and practices will become a focus of trial renders her an atypical and inadequate class representative under Ninth Circuit case law.

## CONCLUSION

For the foregoing reasons, Kellogg Company respectfully requests that the Court deny Plaintiff's Motion for Class Certification.

///

///

Dated:  September 14, 2018                    JENNER & BLOCK LLP


                                              By:    /s/ Kenneth K. Lee
                                                     Kenneth K. Lee

                                              *Attorneys for Defendant*
                                              Kellogg Company